IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| BETTY STEWART, § | |
|     Plaintiff, § | |
| v. § | No. 7:05-CV-212-BF (R) |
| § | ECF |
| COMMISSIONER, SOCIAL SECURITY § | |
| ADMINISTRATION, § | |
|     Defendant. § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. Pursuant to 42 U.S.C. § 405(g), Plaintiff, Betty Stewart, ("Plaintiff") brings this action for judicial review of the final decision of Defendant, Commissioner, Social Security Administration ("Commissioner"), denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").

**I**.

Plaintiff filed for DIB on September 11, 2002, alleging disability since June 11, 2001, due to injuries to the shoulder, arm, and hand; seizures; and poor memory. (Tr. 71-73.) The Commissioner denied Plaintiff's application initially and on reconsideration. (Tr. 45-49, 52-55.) Pursuant to Plaintiff's request, the ALJ held a *de novo* hearing on October 27, 2004. (Tr. 21-44, 56.) Plaintiff and a vocational expert ("VE") testified at the hearing. (Tr. 21-44.) The VE identified Plaintiff's past relevant work ("PRW") as a "cook, short order" (exertionally light and semi-skilled); "baker helper" (medium and skilled); "cashier-checker"(light and semi-skilled); "fast food worker" (light and unskilled); "teacher aide"(light and semi-skilled); and "stapling machine operator" (light as done by Plaintiff and unskilled). (Tr. 34-35.)

On December 17, 2004, the ALJ decided that Plaintiff was able to perform her PRW and

therefore was not disabled and not entitled to DIB. (Tr. 11-18.) The Appeals Council declined review of the ALJ's decision on September 26, 2005, rendering the ALJ's decision the Commissioner's final decision. (Tr. 5-8.) *See* 42 U.S.C. § 405(g).

Plaintiff was born in January, 1951. (Tr. 71.) She has a high school education. (Tr. 95.) She was 50 years old when she allegedly became disabled (June 22, 2001), 51 years old when she applied for benefits (September 11, 2002), and 53 years old on the date of the hearing (October 27, 2004).

According to Plaintiff, the issue for review is whether the Commissioner's finding that Plaintiff could perform her PRW and was not disabled is supported by substantial evidence and/or whether it results from prejudicial legal error. (Tr. 1.)

**II**.

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to

>    be disabled.
>
> 3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.
>
> 4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.
>
> 5. If an individual's impairment precludes the individual from performing the individual's past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. In this case, step four was the last step in the proceedings because the Commissioner determined that Plaintiff could perform her PRW as she performed it and as it is generally performed in the national economy.

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

**III.**

The Court will now set forth the relevant medical evidence. Plaintiff suffered a work-related injury on March 20, 2001. On April 10, 2001, Kenneth L. Yoast, M.D. ("Dr. Yoast") reported that an x-ray of Plaintiff's right wrist revealed only very mild degenerative changes in the distal radial portion of her wrist and no other abnormality. (Tr. 269.) On April 10, 2001, Plaintiff was released to return to work, with restrictions not to climb ladders and not to lift or carry objects weighing more than ten pounds. (Tr.180.) On April 25, 2001, Teresa Schreiber ("Ms. Schreiber"), M.S., O.T.R., C.H.T., indicated that Plaintiff was difficult to test because she was "over-reactive and questionably presents as a malingering type injury." (Tr. 155.) Ms. Schreiber recommended stretching exercises and pendulum exercises, and she noted that Plaintiff had normal range of motion in her right upper extremity. (Tr. 155-56.) On May 4 and 29, 2001, Plaintiff was again released to return to work with the same restrictions. (Tr. 174, 177.) Michael R. Sheen, M.D. ("Dr. Sheen") noted that Plaintiff had an "exaggerated pain response to light touch" on June 13, 2001. (Tr. 167.)

On July 2, 2001, an X-ray of Plaintiff's right wrist showed "no definite abnormality." (Tr. 358.) An MRI of her left shoulder on July 5, 2001, showed mild to moderate impingement of the supraspinatus tendon due to degenerative joint disease of the acromioclavicular joint. (Tr. 357.) On July 12, 2001, Tom S. Talbert, M.D. ("Dr. Talbert") noted "tenderness to the [right] wrist with positive Tinel's sign," recommended further assessment, and planned an EMG/nerve conduction study. (Tr. 169.) He noted that Plaintiff was scheduled to see Dr. Sheen that same day. (Tr. 168.) Dr. Sheen indicated that there was a "significant psychogenic component" to Plaintiff's pain response. (Tr. 167.)

On August 2, 2001, Dr. Sheen noted that a right arm EMG "demonstrate[s] some mild

4

compression of the median nerve consistent with carpal tunnel syndrome" and offered carpal tunnel release surgery. (Tr. 166.)  However, Dr. Sheen indicated that Plaintiff complained of "multiple pains" despite "minimal findings." (*Id.*)  On August 3, 2001, Plaintiff saw Dr. Talbert, who noted that she "declines surgical intervention for both shoulder and wrist" and was "unable to describe any neurologic symptoms or findings consistent with carpal tunnel syndrome."  (Tr. 165.)  On examination, he stated that he found no atrophy, full motion, a negative Phalen's test, and a negative Tinel's sign.  His assessment was "1. Shoulder pain with degenerative joint disease; 2. Hand pain." (*Id.*)  Dr. Talbert's opinion indicated that Plaintiff would receive "no clear benefit from surgical care, either with her shoulder or carpal tunnel syndrome." (*Id.*)  He advised Plaintiff that "she needs to live with this and adjust her activities accordingly." (*Id.*)  He told her that "she should resume a normal lifestyle." (*Id.*)  Dr. Talbert noted that Plaintiff "was reluctant to accept this [admonition]." (*Id.*)

On August 23, 2001, Dr. Talbert again examined Plaintiff and found that she: "[s]hows [an] exaggerated response.  She has tenderness about her left shoulder with tactile tenderness noted. There is pain with cervical compression.  Range of motion shows flexion of 120 degrees, extension of 40 degrees, abduction of 100 degrees, internal rotation of 50 degrees, and external rotation of 80 degrees.  Exam of right wrist shows full functional motion without positive Tinel's or Phalen's signs. There is no reproducible neurologic deficit noted." (Tr. 161.)  Dr. Talbert pointed out that Plaintiff's right wrist failed to reveal "any reproducible findings and was inconsistent as it related to symptoms of carpal tunnel despite the findings on EMG/nerve conduction study, therefore, impairment was not assessed." (*Id.*)  His assessment was: "1. Wrist pain of unknown etiology; 2. Shoulder pain with degenerative problems in her left shoulder." (*Id.*)  He stated that Plaintiff had

5

reached "maximum medical improvement" and, for worker's compensation purposes assigned a 10% upper extremity impairment and a 6% whole person impairment based on the left shoulder findings. (*Id*.) He added:

> It should be of note that this individual is not satisfied with her current findings. Evaluations by numerous assessors have demonstrated inconsistencies and evidence of symptom magnification. In view of these findings, it is treacherous to embark on treatment including surgical care of her shoulder or wrist. She is advised to advance her activities as tolerated and resume an active lifestyle.

(Tr. 161-62.)

Plaintiff exaggerated her symptoms and showed inappropriate illness behavior[1] during a functional capacity evaluation ("FCE") on September 18, 2001, by Gina Blackerby, M.S., P.T. ("Ms. Blackerby"), rendering the FCE invalid. (Tr. 134-54, 192-93.) On September 21, 2001, Dr. Talbert saw Plaintiff, stated her exam findings were unchanged, and directed that she "should return to work based at least in part on restrictions on her FCE, although it is suspected she has a high level of function. She is given [a Texas Rehabilitation Commission] referral in this regard." (Tr. 158.)

On October 10, 2001, Plaintiff was evaluated for worker's compensation purposes by Mark E. Huff, Jr., M.D. ("Dr. Huff"), an orthopedic surgeon. Dr. Huff noted that he had reviewed Plaintiff's medical records, and also noted that Plaintiff had returned to work "with restrictions on lifting and was told on 5-22-01 that the type of work she was doing was aggravating her complaints and she has not worked since." Dr. Huff's examination was largely unremarkable except for limited

---

[1] The "Blankenship System FCE" utilized the "Blankenship Behavioral Profile," which included: (1) a symptom exaggeration profile, (2) an inappropriate illness profile, and (3) a validity profile. (Tr. 152-54, 192.) "Patients scoring high on all three profiles are felt to be attempting to control the test results to demonstrate a greater level of disability than what is actually present, the motivation of which is not known." (Tr. 152.) Plaintiff failed 51% of her "validity criteria." (Tr. 152-154, 192.)

6

ranges of motion in the left shoulder and slight tenderness to palpation on the right wrist, and his diagnoses were "1. Carpal tunnel syndrome, right wrist; 2. Adhesive capsulitis, left shoulder; 3. Painful left shoulder." He stated, "I think she could return to some type of gainful employment, but probably sedentary and not doing any type of repetitive motion, or the use of vibratory tools in her right upper extremity. I would also recommend that she avoid overhead activity with her left upper extremity. Insofar as lifting restrictions, I really don't know because the [FCE] was invalid." (Tr. 270-75.)

On October 16, 2001, Plaintiff was evaluated by David K. Harris, M.D., ("Dr. Harris"), a specialist in physical medicine and rehabilitation, also for worker's compensation purposes. On examination, Dr. Harris noted "tenderness at multiple trapezius attachments on the spine of the scapula and superomedial border of the scapula at the levator scapula insertion . . . tenderness extending as well to involving the left acromioclavicular joint and other trapezius attachments along the distal clavicle . . . mild crepitation in the AC joint with motion. She has mild range of motion deficits in the shoulder . . . Her right preferred upper extremity reveals mild wrist range of motion deficits with 56 degrees of flexion, 51 degrees of extension, 32 degrees of ulnar deviation and 23 degrees of radial deviation . . . mild tenderness along the dorsal aspect of the wrist over the ligamentous complex." His assessment was: "1. Acromioclavicular joint degeneration with mild residual laxity and associated shoulder pain and trapezius myofascial pain syndrome; 2. Right wrist ligamentous strain, dorsal aspect, with mild range of motion loss." He concluded that "Ms. Stewart had a work related injury and this involves connective tissues which remain somewhat limited in healing." On the basis of impairments to both upper extremities, he assigned a 6% whole person impairment. (Tr. 245-50.)

7

On February 19, 2002, Plaintiff underwent another FCE, this time by Ms. Schreiber, an occupational therapist. She noted that the results were judged to be "Valid-Fair Effort." (Tr. 227.) Ms Schreiber thought that Plaintiff was "able to work at the Light-Medium Physical Demand Level for an 8-hour day," limited by occasional squatting, kneeling, stair climbing, crawling and forward or overhead reaching, no ladder climbing, critical balancing, and fine hand ability on the right or left. (Tr. 213-227, 232-33.)

On July 29, 2002, Plaintiff was terminated from her position as "Cook" and was told, "medical documentation states you are only able to lift up to 23 pounds. Therefore, you are no longer physically able to perform the duties of your position." (Tr. 228.)

On December 4, 2002, Ibrahim Dogan, M.D. ("Dr. Dogan") determined that Plaintiff had not had a seizure "in a long time." (Tr. 525.) Dr. Dogan emphasized that Plaintiff had a normal EEG, and he advised her to follow up with her neurologist for "the future discontinuation of the antiseizure medication Dilantin." (*Id*.)

On January 29, 2003, Dr. Dogan reported that Plaintiff had not had any new seizures (Tr. 17, 523.) On April 8, 2003, a consultative examiner, Diane Heinis, M.D. ("Dr. Heinis") evaluated Plaintiff. She noted Plaintiff was 5'3" tall and weighed 248 pounds. On examination, she noted limitation of range of motion in the left shoulder; "some pain on palpation, especially over the right wrist. Tinel's and Phalen's signs are positive on the right . . . She was able to complete a fist and was able to grab a pencil and write her name"; and "altered sensation noted in the 4th digit of the right hand with decreased sensation to touch and hot/cold temperatures." Dr. Heinis noted that a left shoulder X-ray "shows no significant joint space narrowing, some mild arthritic changes and grade II dislocation of the acromioclavicular joint." Her two primary diagnostic assessments were "carpal

8

tunnel syndrome" and "painful left shoulder." She concluded that Plaintiff could "sit, stand, and move about without any difficulty." (Tr. 312-17.)

On May 13, 2003, Richard Kownacki, Ph.D. ("Dr. Kownacki"), a clinical psychologist who was acting as a one-time consultative examiner, conducted a complete psychological evaluation of Plaintiff. (Tr. 319-20.) On mental status examination, Dr. Kownacki noted: "Psychomotor behaviors were slow. Mood was predominantly dysphoric with blunted affect. She was alert and cooperative, and seemed to put forth her best effort. She was rather talkative and thought processes tended to be circumstantial. At times she was tangential and required frequent redirection . . . Remote memory was impaired . . . Short-term memory was impaired. After five minutes she could spontaneously recall only one of three simple words (shoe, tree, car). Attention and concentration were weak, based on [her] need for frequent repetition, and her frequent distractability by external stimuli . . . Judgment and insight are somewhat questionable." His diagnostic assessments were "Amnestic Disorder Not Otherwise Specified-Presumptive" and "Major Depressive Disorder." He assigned a "Global Assessment of Functioning" ("GAF") rating of 40,[2] both currently and as the highest during the preceding year, and a prognosis of "poor." (Tr. 319-22.)

Non-examining state agency physicians provided two separate physical residual capacity assessments for Plaintiff, and they determined that she was capable of performing medium and light work. (Tr. 303-10, 337-44.) State agency non-examining mental health experts provided a

---

[2] GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) ("DSM-IV"). A GAF of 31-40 indicates "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*.

9

psychiatric evaluation of Plaintiff's conditions. (Tr. 323-36.) These mental health experts determined that Plaintiff had no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 333.)

## IV.

The ALJ found that Plaintiff's seizure disorder and degenerative changes in the right wrist and left shoulder were severe, but that they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. (Tr. 15.) The ALJ did not find that Plaintiff had any severe mental impairments. The ALJ determined at step four that Plaintiff had the RFC to perform her PRW and thus was not disabled. Plaintiff contends that the ALJ's RFC finding is not supported by substantial evidence and that his finding of Plaintiff's ability to perform her PRW results from prejudicial legal error. (Pl.'s Br. 9-14.) More specifically, Plaintiff contends that the ALJ chose evidence which supported a finding that Plaintiff was not disabled and ignored other medical evidence that would have led to a determination that she was disabled.

RFC refers to the claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular or continuing basis," eight hours a day, for five days a week or an equivalent work schedule, despite any physical or mental impairments. SSR 96-8p; 20 C.F.R. § 404.1545(a). The ALJ has the responsibility to determine the claimant's RFC at the administrative hearing based on all of the evidence, including the medical records, observations of treating physicians and other acceptable medical sources, and the claimant's own description of her limitations. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). The ALJ must resolve conflicts in the evidence and make credibility determinations based on substantial evidence. *Lovelace v.*

*Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987); *Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981) (per curiam). The ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Id*.

Plaintiff testified that she had difficulty using her left shoulder and right hand. She said that she had only one seizure in the last few years. (Tr. 27-29.) She estimated that she could lift no more than 25 pounds. (*Id.*) Her daily activities included housework, shopping, cooking, and attending church. (Tr. 31-34.) The ALJ found that Plaintiff's allegations regarding her limitations were not totally credible and that she had the RFC for sedentary and light work.[3] (Tr. 17.) Additionally, the ALJ determined that Plaintiff could not work around hazards or heights. (*Id.*) He held that her seizure disorder and degenerative changes in the right wrist and left shoulder did not prevent Plaintiff from performing her PRW. (*Id.*)

Plaintiff contends the ALJ erred by failing to include a restriction for "fine hand ability bilaterally" and by failing to perform a function by function analysis of Plaintiff's work-related abilities. Plaintff contends Ms. Schreiber's FCE of February 2002 (which was rated "valid-fair effort," with a 70-79% validity score) and Dr. Huff's assessment for Plaintiff's worker's compensation claim both require such a limitation. The ALJ stated that "Upon functional capacity

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). Light work includes the ability to do sedentary work. *See id.*

11

evaluation conducted in February 2002 testing indicated that the claimant was capable of light to medium work despite the fact that the claimant put forth only fair effort (Exhibit 1F)." (Tr. 16). However, the FCE also indicated that Plaintiff had "no" fine hand ability bilaterally. (Tr. 233.) Further, "[t]he results of the Purdue Pegboard Assembly test indicate[d] that Ms. Stewart has poor fine motor skills and is not qualified for Assembly Tasks of pieces in the 1-4 mm. range. Additional training [would] be necessary to improve her fine motor skills." (Tr. 222.) Additionally, in "occasional material handling" she scored in the 16th percentile, regarded as "poor." In "hand grip" she scored in the 13th percentile, also regarded as "poor." In "pinch grip" she scored in the 22nd percentile, regarded as "well below average." (Tr. 224.) Dr. Huff, an independent medical examiner, stated, "I think she could return to some type of gainful employment, but probably sedentary and not doing any type of repetitive motion, or the use of vibratory tools in her right upper extremity. I would also recommend that she avoid overhead activity with her left upper extremity." (Tr. 274.) Plaintiff's counsel asked the VE whether these limitations would affect Plaintiff's ability to perform light work. The VE stated that with these limitations, Plaintiff could not perform her past work. (Tr. 41-42.)

The determination of a claimant's RFC status is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2). *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (citing to 20 C.F.R. § 404.1527(e) and (e)(3) to explain that legal conclusions made by a treating physician[4] have no "special significance" and that the ALJ is not required to give such conclusions

---

[4] In this case, Plaintiff is not even complaining that the ALJ ignored the conclusions of a "treating physician." Ms. Schreiber who performed the second FCE is not a physician. Dr. Huff performed a one-time consultative examination for purposes of a worker's compensation claim. *See* 20 C.F.R. § 404.1527(d)(2)(I) (suggesting that a "treating" physician is one who has seen the patient multiple times).

12

controlling weight). Importantly, the test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort. *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). An absence of objective factors which indicate severe or chronic pain, including limitation of joint motion, atrophy, weight loss, or impairment of general nutrition, is significant and can justify an ALJ's conclusion that the complained-of pain is not debilitating. *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988). Further, a claimant's daily activities are relevant to a disability determination. *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).

The ALJ did not err by failing to adopt all of the limitations suggested by Ms. Schreiber or Dr. Huff when the ALJ determined Plaintiff's RFC. The ALJ properly considered the record as a whole, including Plaintiff's daily activities and the absence of objective factors, in making his determination of Plaintiff's RFC. The ALJ was not required to seek VE testimony. *See Williams v. Califano,* 590 F.2d 1332, 1334 (5th Cir. 1979). Nevertheless, the ALJ called a VE to assist him in determining whether Plaintiff's PRW was available to her based upon various hypotheticals. The ALJ necessarily considered whether to include the manipulative limitations because Plaintiff's counsel cross-examined the VE and posed a hypothetical which included those limitations. (Tr. at 41-42.)

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff had no additional manipulative limitations. For example, in April 2001, Ms. Schreiber noted that Plaintiff had normal range of motion of the right upper extremity, and in April and May 2001, Plaintiff was released to work without any specific manipulative limitations in reaching, grasping/squeezing, wrist

13

flexion/extension, overhead reaching, or keyboarding. (Tr. 155, 174, 177, 180.) The ALJ emphasized that Plaintiff had a normal MRI of the right wrist in July 2001, and several physicians reported that she had full range of motion in her hands. (Tr. 16, 165, 315-16, 358.) In October 2001, Dr. Harris determined that Plaintiff had only a 2% whole person loss in the right upper extremity.[5] (Tr. 247, 250.) Plaintiff was suspected of malingering[6] and her doctor repeatedly urged her to resume a "normal" or "active" lifestyle. (Tr. 162, 165.) The ALJ did not err by failing to include a restriction for "fine hand ability bilaterally."

Plaintiff contends that the ALJ erred by failing to include in Plaintiff's RFC a restriction based upon mental limitations and failing to include a function by function assessment of Plaintiff's mental RFC. (Pl.'s Br. at 11-13.) Plaintiff also faults the ALJ for picking and choosing among the findings of the consultative mental status examiner, Dr. Kownacki, in determining Plaintiff's RFC. Plaintiff challenges the ALJ's determination of Plaintiff's mental RFC at step four, particularly the ALJ's failure to incorporate Dr. Kownacki's findings of circumstantial thought processes; tangentiality and a need for frequent redirection; impaired remote memory; impaired short-term

---

[5] The Court notes in passing that although the ALJ did not consider Plaintiff's low worker's compensation ratings because they are not in any way determinative of Social Security disability, the ratings are nevertheless consistent with the ALJ's finding that Plaintiff was not totally disabled. *See, e.g., Forson v. Comm'r of Soc. Sec. Admin.*, 258 F. Supp. 2d 1237, 1246 (D. Kan. 2003) (ALJ properly noted that a fifteen percent partial impairment to the body as a whole was a rating "inconsistent with total disability"); *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985) (a person with a partial disability for purposes of workers' compensation is "not disabled" under the Social Security Act; there are no degrees of "disabled" for purposes of the Social Security Act).

[6] Plaintiff's first FCE was invalid and in her second one, she put forth only "fair" effort. Plaintiff's doctors noted exaggerated responses, inconsistencies in her presentation, suspicions that she had a high level of function, and other indications of malingering. (Tr. 134-54, 155-56, 161-62, 165, 167, 192-93.)

memory illustrated by an inability to recall 2 of 3 simple words after 5 minutes; weak attention and concentration; and somewhat questionable judgment and insight. (Tr. 320.) Plaintiff points out that when Plaintiff's counsel questioned the VE about only two of these limitations, impaired remote and short-term memory, the VE stated: "I don't believe you can maintain the jobs with that kind of a memory loss" (Tr. 42). The Commissioner contends that "the ALJ did not find a severe mental impairment; thus he properly did not include any mental limitations in Plaintiff's residual functional capacity." (Def.'s Br. at 19.) The Commissioner's contention is not entirely correct according to the Policy Interpretation in connection with SSR 96-8p which provides:

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

*Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *5.

Dr. Kownacki's consultative mental status examination was the only evidence of Plaintiff's mental condition from a treating or examining physician or psychologist. (Tr. 320.) The Commissioner argues that it was not entitled to controlling weight because Dr. Kownacki was not a treating physician. (Def.'s Br. at 17.) This statement is accurate; however, the question is not whether Dr. Kownacki's evaluation was entitled to controlling weight. Rather the issue is whether the ALJ properly considered the uncontroverted evidence of mental limitations.

The ALJ stated that Dr. Kownacki's relevant negative findings with respect to Plaintiff's

15

mental status included alert and cooperative demeanor, orientation in all spheres, and the absence of overt psychotic behavior. (Tr. 17, 320.) The ALJ did not address or even mention any of Dr. Kownacki's findings that may have imposed limitations on Plaintiff's mental RFC. An ALJ may not arbitrarily reject, explicitly or *sub silentio*, uncontradicted medical evidence. *Strickland v. Harris*, 615 F.2d 1103, 1110 (5th Cir. 1980); *Goodley v. Harris*, 608 F.2d 234, 236 (5th Cir. 1979). In the Fifth Circuit, although an ALJ is not bound to follow formalistic rules, nevertheless, he is bound by the rules "to explain his reasons for rejecting a claimant's complaints." *Falco*, 27 F.3d at 164. Here, the ALJ gave absolutely no explanation for accepting Dr. Kownacki's negative findings and rejecting his findings that were positive for mental limitations. *See Loza*, 219 F.3d at 393-94. Plaintiff was prejudiced because the VE stated that an individual with the short term and remote memory problems that Dr. Kownacki found in Plaintiff would be unable to perform Plaintiff's PRW. The VE's testimony shows that the outcome might have been different. *See Carey v. Apfel*, 230 F.3d 131, 143 (5th Cir. 2000).

Plaintiff also alleges that the ALJ erred by failing to perform a function-by-function assessment of Plaintiff's physical and mental RFC as required by SSR 96-8p. *See* SSR 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620-21 (5th Cir. 2001).[7] Further, Plaintiff contends the ALJ failed to directly

---

[7] Defendant contends that *Myers* is distinguishable and a function-by function assessment is not required because in this case there is substantial evidence to support the ALJ's finding that Plaintiff had no additional manipulative limitations or mental limitations. Nevertheless, a plain reading of SSR 96-8p requires that the ALJ "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function by function basis" before the "RFC may be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p. In this case, the ALJ's function by function physical assessment stated, that "the claimant was assessed to [sic] capable of sitting, standing, and moving about with difficulty. . . ." (Tr. 17.) The mental assessment stated that she was alert and cooperative, oriented in all spheres, and lacked overt psychotic behavior. (*Id.*) This assessment, which is confusing and incomplete at best, does not comply with the regulation

16

compare Plaintiff's RFC with the physical and mental demands of her past work. *See Latham v. Shalala*, 36 F.3d 482-84 (5th Cir. 1994). When making a finding that an applicant can return to her past work, the ALJ must directly compare the claimant's remaining functional capacities with the physical and mental demands of her previous work. *Latham*, 36 F.3d at 484; 20 C.F.R. § 404.1520(e) (1994). The ALJ must make clear factual findings on that issue and may not rely upon generic classifications. *Latham*, 36 F.3d at 484.

Here, the ALJ failed to perform the function by function assessment of Plaintiff's physical and mental RFC as required by SSR 96-8p. Although a narrative can be acceptable, the ALJ's discussion of the demands of Plaintiff's past work fell short. He stated: "The vocational expert testified that the claimant's past relevant work includes light work as a short order cook, a fast food worker, a teacher's aide, and a cashier/checker. The undersigned finds that the claimant's residual functional capacity would allow her to return to these occupations." (Tr. 17.) Among the past jobs which the ALJ found Plaintiff could perform was "cook, short-order." The ALJ did not discuss the manipulative or mental demands of Plaintiff's past work. More specifically, the ALJ did not reconcile his finding with the evidence that Plaintiff was terminated from her position as "Cook" on July 29, 2002, because: "medical documentation states you are only able to lift up to 23 pounds. Therefore, you are no longer physically able to perform the duties of your position." (Tr. 228). Plaintiff's position as cook, as she performed it, must have required her to lift more than 23 pounds, whereas light work, which the ALJ found Plaintiff could perform, involves lifting no more than 20 pounds. *See* 20 C.F.R. § 404.1567(b).

The ALJ found that Plaintiff had a RFC for light work and, based on the testimony of the VE,

---

or with the teachings of *Myers*.

he decided that Plaintiff's past employment required light exertion capacity and that Plaintiff could perform her PRW. The category of light is generic. It also refers only to exertional capabilities and does not address mental barriers to a return to previous employment. The ALJ's finding that Plaintiff could perform her PRW, including the job of cook, is not supported by substantial evidence and is the result of legal error. This is true because the ALJ failed to perform the function by function analysis, failed to properly analyze the demands of Plaintiff's past work, and relied upon generic classifications.

## V.

The ALJ arbitrarily rejected *sub silentio* certain findings from Dr. Kownacki's uncontradicted psychological evaluation of Plaintiff. The ALJ also failed to perform a complete function-by- function analysis of Plaintiff's physical and mental RFC, and failed to analyze the physical and mental demands of Plaintiff's PRW. The Commissioner's decision is not supported by substantial evidence and is the result of prejudicial legal error. Accordingly, the Commissioner's decision is vacated, and the case is remanded to the Commissioner at step four to reassess Plaintiff's physical and mental RFC in compliance with SSR 96-8p while giving fair consideration to the full record (including all the findings from Dr. Kownacki's psychological evaluation); to properly analyze the mental and physical demands of Plaintiff's past work; to reach a new finding on the issue of whether Plaintiff could perform any PRW; and, if it is found that she could not do so, to address step five.

Signed, March 22, 2007.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

18